**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 3:26-65** |
| **CHARLES NORRIS,** | : | **(JUDGE MANNION)** |
| **Defendant** | : | |

**MEMORANDUM**

Pending before the Court is Defendant Charles Norris's motion to suppress evidence. (**Doc. 22**). For the reasons discussed below, after consideration of the briefs, exhibits submitted, including bodycam video recordings, and the evidentiary hearing on October 13, 2026, the motion to suppress the evidence will be **DENIED**.

## I. BACKGROUND[1]

On March 22, 2025, at approximately 2:09 a.m., Officer Jose Medina-Pena and Officer Matthew Bonawits of the Kingston Police Department were on patrol in a marked police vehicle in the vicinity of a Turkey Hill

---

[1] The Court notes that, for present purposes, it bases the factual background of this case on the briefs of the parties, the accompanying exhibits, including the bodycam recordings of the encounter on March 22, 2025, and testimony at the evidentiary hearing on October 13, 2026.

convenience store located at 776 Rutter Avenue, Kingston, Pennsylvania. (Doc. 29-4 at 5). This Turkey Hill was, according to the officers, well-known as a high-crime area due to the Kingston Police Department receiving multiple complaints of drug sales and other narcotics activity occurring outside the store late at night. *Id.*

When the officers approached the Turkey Hill, they observed a male and female standing directly in front of the closed store. *Id.* Upon sight of the individuals, both officers activated their body-worn cameras. (Doc. 29 at 4). The male was seated on an electric bicycle and wore a heavy jacket and backpack. The female wore a hooded sweatshirt and appeared to be traveling on foot, as no other vehicle was spotted. *Id.* According to the officers, the female "appeared stunned by [p]olice presence, turned around and looked into the store as if she did not want [p]olice to see or recognize her." (Doc. 29-4 at 5).

Officer Bonawits asked the pair to identify themselves. The male identified himself as Charles Norris, and the female identified herself as Candise Chulada. *Id.* The pair indicated that they were going to go back to Norris's residence on Melrose Avenue in Wilkes-Barre, about two miles from the Turkey Hill. (Doc. 29 at 7). The officers reported that "both individuals

were nervous about their encounter with [p]olice and attempted to expedite our interaction with the both of them." (Doc. 29-4 at 5).

After getting their names, Officer Bonawits returned to his patrol vehicle and ran them through a law enforcement database to see if either individual had open arrests and/or warrants. (Doc. 29 at 6). The search revealed that Norris had no outstanding warrants and that he did not have a concealed carry permit. *Id.* Chulada, on the other hand, had an open warrant for failure to appear at several criminal hearings in Luzerne County—including cases where she was charged with drug-related crimes—and was ultimately placed under arrest and secured in a patrol vehicle. *Id.* at 7.

Officer Bonawits then conducted a pat-down on Norris for weapons due to "both individuals prowling in the area of a closed business, recent narcotics related complaints in the area," Norris exhibiting signs of nervousness, Norris's intent to expedite the interaction, and out of fear that Norris was "armed and dangerous." (Doc. 29-4 at 6). Upon doing so, Officer Bonawits felt an object on Norris that he immediately identified as being a firearm. *Id.* The firearm (a Ruger LCP .380 caliber handgun, serial number 372517136) was recovered from Norris's front chest coat pocket, and he was

then detained in handcuffs. *Id.* The firearm had previously been reported stolen in Scranton, Pennsylvania in December of 2024. *Id.*

The officers then searched Norris's backpack and found "a digital scale, packaging material, $7,818.00 in United States Currency, [and] distribution quantities of fentanyl/heroin, powder cocaine, crack cocaine, crystal methamphetamine, [e]cstasy (MDMA), marijuana, and [p]silocybin mushrooms." *Id.*

After his arrest, Norris was transported to the Kingston Police Department where he made a video-recorded statement after being read his *Miranda* warnings. *Id.* Norris admitted that he is an active drug user and that he sells drugs. *Id.* Norris further admitted that he met with Chulada to have sex and had intended on giving her drugs as payment for the sex. *Id.* Norris also admitted that he knew the firearm he had in his possession was stolen. *Id.* He stated that an associate of his stole the firearm from a narcotics trafficker and provided it to him approximately three months prior. *Id.* Norris stated that he paid his associate in fentanyl for the firearm. *Id.*

On March 31, 2026, a three-count federal indictment was issued, charging Norris with: (1) possession with intent to distribute controlled substances, in violation of 21 U.S.C. §841(a)(1); (2) possession of a firearm

in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §924(c); and (3) possession of a stolen firearm, in violation of 18 U.S.C. §922(j). (Doc. 1). Norris pleaded not guilty to the charges. (Doc. 16).

On May 1, 2026, Norris filed the instant motion to suppress all evidence seized during the encounter and after, as well as an accompanying brief in support. (Docs. 22, 23). On May 29, 2026, the Government filed a brief in opposition. (Doc. 29). On June 12, 2026, Norris filed a reply brief. (Doc. 31). On October 13, 2026, the Court conducted a hearing regarding the instant motion and allowed the parties to file supplemental briefing following the hearing. (Doc. 41). On October 30, 2026, the parties filed post-hearing supplemental briefs. (Docs. 43, 44). The matter is now ripe for disposition.

## II. LEGAL STANDARD

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. *Lange v. California*, 594 U.S. 295, 301 (2021).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." *Adams v. Springmeyer*, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing *McDonald v. City of Chicago*, 561 U.S. 742, 753-55, (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Generally, a search "requires a warrant supported by probable cause." *Carpenter v. United States*, 585 U.S. 296, 297 (2018) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "Probable cause exists when there

is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (citations and internal quotations omitted). An affidavit in support of a search warrant "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996).

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." *United States v. Ellis*, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). "Under *Katz*, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place,

but whether the person asserting the claim has a legitimate expectation of privacy." *Id.* (citations omitted).

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Lara-Mejia*, 482 F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" *Id.* "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *Id.* (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation omitted). Stated otherwise, where the search or seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred

and that it was then supported by reasonable suspicion." *United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011).

## III. DISCUSSION

Norris raises four arguments in support of his motion to suppress: (1) the officers lacked reasonable suspicion that Norris was engaged in criminal activity and therefore the seizure was illegal at inception; (2) the officers lacked reasonable suspicion that Norris was armed and dangerous when they conducted the pat-down; (3) the officers illegally prolonged the stop; and (4) Officer Bonawits's most reliable account of the stop is the account recorded in his incident report. (Doc. 23 at 5; Doc. 44 at 4). The Court will address each of these arguments below.

### A. The officers had a reasonable suspicion that Norris was engaged in criminal activity

The Supreme Court has "held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion "is a less demanding standard than probable

cause and requires a showing considerably less than preponderance of the evidence." *Id.* However, an officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity" to establish reasonable suspicion. *Id.* at 123-24 (citations and internal quotations omitted). The "reasonable suspicion analysis must be limited to the facts known to the officers when they effected a *Terry* stop." *Lowe*, 791 F.3d at 435. Moreover, such reasonableness "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

Here, Norris argues that "the officers' description of the conduct and surrounding circumstances suggests [the] officers lacked reasonable suspicion that Norris was involved in criminal activity." (Doc 23 at 8). The Court disagrees.

When Norris was first stopped, several facts supported the officers' having a reasonable and articulable suspicion that Norris and Chulada were engaged in drug-related criminal activity. Specifically, Norris and Chulada were observed outside of the closed Turkey Hill around 2:09 a.m. on a cold morning. (Doc. 42 at 13:6-17, 14:18-22). This particular Turkey Hill location was allegedly a known drug-trafficking site, as it had been the subject of

numerous citizen complaints reporting drug transactions occurring on the premises after closing throughout the years, including a complaint that was as recent as 2025. (Doc. 29-4 at 5; Doc. 42 at 11:23-13:5). Additionally, Norris was wearing a winter jacket and seated on a single-seat bike with a backpack on his shoulder. *Id.* at 15:5-10. Contrarily, Chulada was not dressed for the cold weather—wearing a "light hoodie, not much clothing"—and was on foot. *Id.* at 15:3-4, 15:11-15. This contrast indicates that the pair did not come to Turkey Hill together but instead had met there, signaling to the officers that they had met to conduct a drug transaction. Further, Chulada turned her head away from the officers when they first pulled into the parking lot, which appeared to the officers that "she was trying to disguise her face." *Id.* at 14:20-24.

In sum, the inquiry is not whether the officers' suspicions were correct, but whether they were reasonable. The officers' observation of Norris and Chulada outside of a closed establishment in a manner indicating a potential drug transaction constituted sufficient grounds for the development of a reasonable suspicion of criminal activity.

### B. Reasonable suspicion existed for the officers to conduct a pat-down of Norris

As previously mentioned, although an officer must "articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity," reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois*, 528 U.S. at 123-24 (citations and internal quotations omitted).

Here, Norris argues that the officers lacked the reasonable suspicion needed to justify the pat-down. (Doc. 23 at 9). Specifically, he contends that Officer Bonawits did not have a reasonable belief that his safety or that of others was in danger since the officers could not reasonably suspect Norris of drug trafficking and there was no evidence of Norris physically attempting to conceal a weapon. (Doc. 44 at 4, 9-10). The Court disagrees. There are numerous factors that Officer Bonawits was aware of when he conducted the pat-down that supported reasonable suspicion that the pair were engaged in a drug transaction and, therefore, his safety or that of others was in danger.

*First*, Norris's and Chulada's presence outside of the Turkey Hill location. As the Court has noted, this particular location was allegedly a known drug-trafficking site that had been the subject of numerous citizen

complaints reporting drug transactions occurring on the premises after closing. (Doc. 29-4 at 5; Doc. 42 at 11:23-13:5).

*Second*, the apparent lie that Norris and Chulada were going to travel together to Norris's residence. The pair were observed outside of a closed convenience store around 2:09 a.m. on a cold morning, (Doc. 42 at 13:6-17, 14:18-22), and claimed that they were heading to Norris's house, which Officer Bonawits estimated was "[p]robably two miles, a good distance" from the Turkey Hill location that would take "over an hour" to walk. *Id.* at 19:5-20:2. Norris was wearing a winter jacket and seated on a single-seat bike with a backpack on his shoulder. *Id.* at 15:5-10. Contrarily, Chulada was wearing a "light hoodie, not much clothing" and was on foot. *Id.* at 15:3-4, 15:11-15. Officer Bonawits testified that "[r]eally didn't make sense" to him that the pair would be heading to Norris's residence "being that it was cold out" when Chulada's residence—an approximate thirty-to-forty-minute walk—was closer. *Id.* 20:3-21. It was reasonable for Officer Bonawits to be suspicious of the claim that the pair were planning to walk over an hour to Norris's residence while Chulada was dressed in only light clothing on a cold morning. *See United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016)

(discussing "dubious travel plans" as a factor in the reasonable suspicion analysis).

*Third*, Norris's and Chulada's physical appearance and demeanor during the stop. Officer Bonawits testified that the physical appearance of both Norris and Chulada indicated they were drug users. (Doc. 42 at 18:4-11, 21:22-22:6). When the officers initially approached the store, Chulada turned her face to look into the store, which indicated to Officer Bonawits that "she was trying to disguise her face, she didn't want to be identified by the police." *Id.* at 16:10-13. Officer Bonawits also testified that the pair were "extremely nervous" and "tried to expedite our whole interaction together." *Id.* at 23:2-4. Moreover, Norris's reaction to being asked whether he was armed provided reason for Officer Bonawits to suspect that Norris had a weapon on him. Officer Bonawits testified that Norris "looked down at the ground, did not look at me in the face and shook his head and said no" when asked if he had any weapons on him, which indicated to Officer Bonawits that Norris was lying to him. *Id.* at 23:21-24:4. This response was different than Norris's responses to other questioning from the officers. *Id.* at 24:12-19.

*Fourth*, the officers learned during the stop that Chulada had an open warrant for arrest for failure to appear in court on a prior drug possession charge. *Id.* at 21:1-4. Moreover, the address that Chulada claimed to have left when she traveled to the convenience store was associated with a known drug user. *Id.* at 23:12-20.

When "evaluating whether reasonable suspicion existed, a court 'must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior.'" *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (quoting *United States v. Robertson,* 305 F.3d 164, 167 (3d Cir.2002)). When considered together, the circumstances Officer Bonawits observed gave reasonable suspicion that Norris and Chulada were engaged in a drug transaction. *See United States v. Sears*, 835 F. App'x 671, 674 (3d Cir. 2020) ("To evaluate reasonable suspicion, we consider the totality of the circumstances, including, as relevant here, (1) a high crime rate in the area, (2) a late hour at night, (3) nervous or evasive behavior by the suspect, and (4) other behavior by the suspect that indicates criminal activity to a police officer's expert eye.") (internal citations and quotations omitted).

Due to Officer Bonawits's training and experience, he was aware that drug dealers typically carry weapons especially if they are in possession of a large quantity of drugs. (Doc. 42 at 22:20-24, 24:7-14). Therefore, Officer Bonawits had a reasonable belief that his safety or that of others was in danger when he frisked Norris. *See United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) (holding that an officer pat down search was lawful where the officer was suspicious the money he observed was drug money and "became concerned for his safety because persons involved with drugs often carry weapons"); *United States v. Sanchez*, 398 F. App'x 840, 843 (3d Cir. 2010) ("Given that drug traffickers often carry weapons and reasonable suspicion existed that the Appellants were drug dealers, the troopers reasonably suspected that both Appellants were armed and dangerous, justifying the minimally invasive search.").

Ultimately, Officer Bonawits's pat-down of Norris was not based on a mere hunch; it was based on facts, training, and experience that led to a reasonable suspicion that Norris could be armed. Thus, the Court finds, in order to protect himself and others, Officer Bonawits conducted a reasonable pat-down and did not violate the defendant's Fourth Amendment rights.

## C. The officers did not illegally prolong the stop

To determine "whether a detention is too long in duration to be justified as an investigative stop," courts "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (internal citations omitted). During such stops, police may check identifications and ask questions because these actions "promote[ ] the strong government interest in solving crimes and bringing offenders to justice." *United States v. Hensley*, 469 U.S. 221, 229 (1985).

Factors the court should consider in determining whether an investigative detention was unreasonable include: "(1) the duration of the stop; (2) the purposes justifying the investigatory detention; (3) whether the police acted diligently to confirm or dispel their suspicions; and (4) any reasonable alternatives the police could have employed to serve their purposes." *United States v. Fraguela-Casanova*, 858 F.Supp.2d 432, 442 (M.D.Pa. 2012) (citing *Sharpe*, 470 U.S. at 684-87; *United States v. Leal*, 235 F.App'x 937, 941 (3d Cir. 2007)).

Here, Norris argues that his seizure should have ended once officers had completed their questioning, verified his identity through database checks, and confirmed the absence of any active warrants. (Doc. 23 at 8). The Government argues, *inter alia*, that Norris overlooks two significant facts: he and Chulada were clearly lying to the officers during questioning, and Chulada had an outstanding warrant for a drug-related offense, each of which reinforced the officers' reasonable suspicion that the pair were at the Turkey Hill to engage in a drug transaction. (Doc. 29 at 20-21). The Court agrees with the Government.

When the officers initially approached Norris and Chulada, they already, as the Court has noted, had a reasonable suspicion that the pair were committing a drug transaction. They had no duty to believe the pair's story about traveling back to Norris's residence (with Chulada on foot and Norris on his bike) approximately two miles away late at night. Instead, this apparent fabrication gave credence to the suspicion that the pair were meeting at the Turkey Hill for a drug transaction.

The officers worked diligently to either confirm or dispel their reasonable suspicion. Within minutes, the officers observed indicia of criminality—*e.g.*, Chulada's open warrant, the pair's nervousness and

attempts to expedite the interaction, and their doubtful reason for being at the Turkey Hill—that would lead a reasonable officer to infer that Norris and Chulada met to engage in a drug transaction. The officers then questioned them, ran background checks, frisked Norris, and arrested them.

There were no other investigatory steps that could have been taken to expedite the encounter. Nor did the officers take any unnecessary and dilatory actions. Accordingly, the Court finds that the officers diligently pursued the legitimate purpose of the stop and did not unnecessarily prolong the stop.

**D. Reliability of Officer Bonawits's account**

Norris argues that Officer Bonawits's incident report is the most reliable account of the traffic stop whereas his subsequent testimony at the hearing is less reliable. (Doc. 44 at 16-17). He states that "[t]he Court may conclude some or all of Bonawits's testimony regarding observations not included in his Incident Report is unreliable." *Id.* at 21. Norris's argument "mistakes the purpose of a police report, which is not an all-encompassing account of exactly what was said and done during an encounter between a law enforcement agent and a private citizen, but rather is a summary of what occurred." *United States v. Freeman*, 691 F.3d 893, 900-01 (7th Cir. 2012)

(citations and internal quotations omitted). The Court finds Officer Bonawits's testimony at the evidentiary hearing regarding observations that were not included in his initial incident report was credible.

## IV. CONCLUSION

For the aforesaid reasons, Norris's motion to suppress evidence will be **DENIED**. The evidence seized during the March 22, 2025 stop is admissible along with any derivative evidence from the stop. An appropriate order follows.

**MALACHY E. MANNION**
**United States District Judge**

**DATE:** 11/20/26
26-65-01